**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| INTERFLOW (TANK CONTAINER SYSTEM) LTD., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-2871 |
| | § | |
| BURLINGTON NORTHERN SANTA FE RAILWAY CO., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The following motions are pending in this cargo case:

- Defendant Burlington Northern Santa Fe Railway Company's Motion for Summary Judgment. (Docket Entry No. 26).

- Defendants Burlington Northern Santa Fe Railway Company and Hyundai Merchant Marine Co. Ltd.'s Motion for Partial Summary Judgment. (Docket Entry No. 27).

- Plaintiff Interflow Tank Container System Ltd.'s Cross-Motion for Summary Judgment against Hyundai Merchant Marine Co. Ltd. (Docket Entry No. 32).

Based on the parties' motions and responses, the summary judgment record, and the applicable law, this court grants defendants' joint motion for partial summary judgment as to damages and grants in part Burlington's motion for summary judgment as to damages; does not reach the alternative portion of Burlington's motion for summary judgment; and denies Interflow's cross-motion for summary judgment against Hyundai. The reasons for these rulings are set out in detail below.

I.      **Background**

Many of the relevant facts are undisputed.  On July 16, 2003, Interflow Tank Container System, Ltd. delivered to Hyundai Merchant Marine two twenty-foot ISO tanks containing lubricating oil to ship from Houston, Texas to Nagoya, Japan.  The tanks were to be shipped to California by rail and then on a Hyundai vessel to Nagoya, Japan.  (Docket Entry No. 1, ¶ 6).  An ISO tank is a tank surrounded by an open structure, with supporting braces.  (Docket Entry No. 27, Ex. A, ¶ 2).  Interflow owned the cargo; Hyundai transports cargo on behalf of cargo owners and shippers such as Interflow.

Interflow had been a Hyundai customer since 1998.  (Docket Entry No. 27, p. 7).  Interflow and Hyundai had entered into a service agreement under which Interflow would provide a minimum number of tank containers for shipment during the contract term and Hyundai would charge a set flat freight rate for each tank container that was shipped.  The two ISO tanks at issue were to be shipped under the service agreement between Hyundai and Interflow.[1]  The agreement incorporates Hyundai's standard bill of lading and the provisions of Hyundai's Essential Terms Tariff and Tariff of General Applicability.  The Tariff of General Applicability applies to shipments from the United States to North and South Asia.  (Docket Entry No. 27, Ex. A, ¶ 5).  The standard bill of lading and the tariffs are available

---

[1]

The agreement between Interflow and Hyundai has a binding arbitration provision.  (Docket Entry No. 27, Ex. A-2, ll. 279–96).  Neither Interflow nor Hyundai refers to the provision nor suggests that this suit should be subject to arbitration.  The parties have waived arbitration by substantially invoking the judicial process.  *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004) (quoting *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 326, 329 (5th Cir. 1999)).

on the Hyundai website.  A customer, such as Interflow, obtains access to information on the website through a user number and password.  Interflow has had user numbers and passwords since 1998.  (*Id*., ¶ 6).

Although a lading number was affixed to the ISO tank shipment, (Docket Entry No. 31, Ex. D; Docket Entry No. 27, Ex. A-6), and although a waybill was issued for the rail portion of the shipment, (Docket Entry No. 27, Ex. A-2), the tanks were damaged before the ocean bill of lading issued.  Hyundai had subcontracted with Burlington to transport the tanks by rail from Houston, Texas to Long Beach, California, there to be loaded on the Hyundai vessel for the ocean leg of the shipment to Japan.  (Docket Entry No. 1, ¶¶ 1, 5, 7).  The tanks were delivered to Burlington's yard and on July 24, 2003, Burlington placed the tanks onto railcars.  Parts of the rail came loose, causing a derailment and piercing the tanks.  The tanks were damaged and their contents lost.  (Docket Entry No. 26, ¶¶ 1, 3; Docket Entry No. 27, p. 3).  Interflow asserts that the derailment was caused by Burlington's negligence, citing an unreasonably high rate of speed for coupling the cars in the rail yard; Burlington disputes the cause of the derailment.  The damaged tanks were set aside and not carried to California. (Docket Entry No. 27, p. 3).  An ocean bill of lading did not issue.

When Burlington received the cargo, it was declared as "freight of all kinds," or "FAK."  (Docket Entry No. 26, ¶ 3).  Under Burlington's Intermodal Rules, ISO tank containers must be marked as "AAR 600" to show that they meet the requirements of the Association of American Railroads (AAR), and cannot be billed as "FAK."  The tanks should have been designated as a restricted commodity and shipped at a higher rate.  Under

Burlington's Intermodal Rules and Policies Guide, Items 26 and 45, such misdesignation of cargo places "all aspects of liability with the shipper," making the shipper liable for all "associated costs resulting from tendering restricted commodities and equipment," and requiring the shipper to hold Burlington harmless for negligence.  (*Id.*, pp. 3–4).  Based on the Rules and Policies Guide, Burlington declined responsibility for the loss of the cargo, citing Interflow's misdesignation of the cargo as "FAK."

Interflow sued both Burlington and Hyundai under the ICC Termination Act, 49 U.S.C. § 10101 *et seq.* (1997), and Texas state law, alleging that their negligence resulted in the damage to the ISO tanks and the loss of the cargo.  (Docket Entry No. 3, ¶¶ 9–14). Burlington and Hyundai jointly moved for partial summary judgment on the issue of damages.  (Docket Entry No. 27).  Both defendants argue that the ISO tank shipment was subject to the protections of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5), which limits a cargo owner's  recovery to $500 per package or customary freight unit unless the owner declares a higher value and pays a higher rate.  Defendants point to the presence of a Limitation of Liability provision in Hyundai's standard bill of lading and tariff, which explicitly incorporates COGSA's $500 per package limitation on damaged goods, unless "the value (and nature) of the Goods higher than this amount has been declared in writing by the Merchant before receipt of the Goods by the Ocean Carrier and inserted on the face of the Bill of Lading, and extra freight has been paid as required."  (Docket Entry No. 27, Ex. A-5, ¶ 25(B)(1)).  The standard bill of lading and tariff also contain a Clause Paramount, which states that COGSA applies throughout the time the goods are in the

custody of the ocean carrier; and a Himalaya Clause, which states that the protections of the bill of lading and tariff extend to the carrier's agents and subcontractors.  (Docket Entry No. 27, p. 3; Ex. A-5, ¶ 4).).  Defendants urge that Hyundai's standard bill of lading and tariff applied to limit the damages amount to $1,000.

In response to defendants' joint motion for partial summary judgment, Interflow argues that defendants cannot rely on an as-yet-unissued ocean bill of lading and that Interflow was not offered alternative rates as necessary for the COGSA liability limits to apply.  In response to Hyundai's motion for partial summary judgment, Interflow cross-moves for summary judgment, arguing that Hyundai's improper designation of the ISO tanks as "FAK" made Hyundai liable under its contract with Burlington to pay Interflow for the repair of the ISO tanks.  (Docket Entry No. 31, p. 9).

Burlington separately filed a motion for summary judgment.  (Docket Entry No. 26). Although Burlington stated that it was moving only on the issue of damages, it appears to seek summary judgment as to liability and only alternatively as to damages.  Burlington argues that because Hyundai misdesignated the tanks and their contents as "FAK," Burlington has no liability for any of the cargo loss.  (Docket Entry No. 26, pp. 8–9).  In the alternative, Burlington repeats the motion for partial summary judgment that it made jointly with Hyundai, arguing that it can only be held liable for $500 per tank in damages.  (*Id.*, p. 9).  Because this court finds that the $500 per package limit on damages applies, and because Burlington asserts that it is seeking summary judgment only as to damages, this court does not reach Burlington's alternative motion as to liability.

## II.    The Applicable Legal Standards

### A.    Federal Law

"When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co. v. Kirby*, 125 S. Ct. 385, 392 (2004) (citing *Kossick v. United Fruit Co.*, 365 731, 742 (1961)).  The maritime nature of a contract depends neither on whether a "ship or other vessel was involved in the dispute" nor on the "place of the contract's formation or performance." *Id.* at 393 (citations omitted).  The issue is whether the anticipated nature of the transaction is maritime. *Id.*  When, as here, the contract's primary objective is to accomplish the transportation of goods by sea from the United States to another country, the contract is a "maritime contract" governed by federal law. *Id.*  The contract is maritime in nature even if it calls for some performance on land, such as when part of the voyage is by rail. *Id.*  "[A contract's] character as a maritime contact is not defeated simply because it also provides for some land carriage." *Id.* at 395.

### B.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary

documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288

F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid

Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.   Defendants' Motion for Partial Summary Judgment as to Damages

COGSA governs ocean carriage to and from the United States.  46 U.S.C. §§

1300–1315.  COGSA limits the potential liability of a carrier for "any loss or damage to or

in connection with the transportation of goods" to a default value of $500 per package or

customary freight unit, unless the shipper declared the nature and the value of the goods

before shipment and inserted them in the bill of lading.  46 U.S.C. § 1304(5); *Foster Wheeler

Energy Corp. v. An Ning Jiang MV*, 383 F.3d 349, 352 (5th Cir. 2004).  Section 1304(5)

provides that a carrier and shipper may agree on a different maximum amount, as long as it

is not less than the statutory figure and not more than the amount of damages actually

sustained.  If COGSA applies and a shipper does not declare a higher value on the bill of

lading or contract for a different maximum amount, a carrier's liability is limited to the

default amount of $500 per package or customary freight unit.  This rule recognizes that

because shippers often do not disclose the contents of their containers and packages to the

carriers that transport them, shippers are in the best position to evaluate the cargo value.  If

shippers find the $500 per package limit insufficient, they may obtain full coverage by

declaring the nature and value of the goods in the bill of lading and paying a higher tariff.

COGSA applies from the time the cargo is loaded to the time when it is discharged from the vessel.  46 U.S.C. § 1301(e).  A carrier and shipper may expressly cover by contract the period before loading and after discharge when the goods are in the carrier's possession, including any period of land transport.  The application of COGSA can be extended through a Clause Paramount in a bill of lading.  *Foster Wheeler*, 383 F.3d at 355–56; *SPM Corp. v. M/V MING MOON*, 965 F.2d 1297, 1301 (3rd Cir. 1992).

The first issue is whether Interflow's claim is limited to the $500 per package freight limit provided under COGSA.  Defendants argue that the standard Hyundai bill of lading terms or the applicable tariff terms establish the applicability of the COGSA damages limits.  Interflow argues that the shipment was not governed by a bill of lading because "[n]o such document was proposed, or agreed to by [it]."  (Docket Entry No. 30, p. 3).  Interflow argues that the COGSA terms do not apply because the ISO tanks were never shipped from the Burlington yard and no bill of lading covering the tanks issued.  (Docket Entry No. 30, pp. 3, 7).  Instead, because the damage to the shipment occurred in Burlington's Texas rail yard, Interflow argues that Texas law governs and that no limitation on damages applies.  (*Id.*).

The Fifth Circuit has long recognized that the terms of a bill of lading that would have been issued, but did not because the cargo was damaged before the bill of lading could issue can nonetheless bind the parties.  In *Luckenbach S.S. Co., Inc. v. Am. Mills Co.*, 24 F.2d 704 (5th Cir. 1928), the Fifth Circuit held that the bill of lading term that exempted a carrier from liability for loss by fire was effective, even though the bill of lading did not issue until after a fire had damaged the goods at issue.  24 F.2d at 705.  The court held that "an implied

understanding arose from common business experience that the carrier would issue such bill of lading as it was its custom to issue to shippers in the usual course of business." *Id.*  The bill of lading ultimately issued in the *Luckenbach* case was a standard form used by the carrier.  "Appellant's bill of lading was issued after the fire, but it was in accordance with its standard form, issued to all shippers alike, and was not made to fit a special case, in order to escape a liability that had already accrued.  It, therefore, but evidenced the contract the parties entered into at the time the goods were delivered and accepted. . . . [A] shipper, in the absence of a special contract, must be presumed to deliver his goods on the terms and conditions usually and customarily imposed by the carrier in the regular course of business." *Id.*  In *Luckenbach*, the court recognized that in the regular course of shipping, a bill of lading issues after cargo is loaded but governs the parties' relationship even before loading occurs.

In  *Baker Oil Tools v. Delta Steamship Lines, Inc.*, 562 F.2d 938 (5th Cir. 1977), the Fifth Circuit also recognized that if cargo is damaged before it is loaded, and a bill of lading does not issue covering that cargo, the standard terms of the carrier's bill of lading nonetheless apply.  The court held the parties to the terms of the bill of lading that would have issued.  Because the bill of lading would have incorporated COGSA and made it applicable to the period of custody before loading, the carrier was liable to the shipper under COGSA.  The court noted that a bill of lading had not issued when the cargo was damaged because the bill of lading typically issues at loading.  *Id*. at 940.  In that case, however, the court held that the carrier could not rely on the provisions limiting liability under COGSA because the carrier had cancelled the port of call after taking the goods, breaching the

contract and terminating the limitation provision.  *Baker Oil Tools* did recognize that a carrier's liability for cargo damage may be limited by the terms of the carrier's standard bill of lading, even when no bill of lading issued for cargo because it was damaged before loading.

In *Uncle Ben's Int'l Division of Uncle Ben's, Inc. v. Hapag-Lloyd Akteingesellschaft, et al.*, 855 F.2d 215, 217 (5th Cir. 1988), the Fifth Circuit reiterated the rule of *Baker Oil*, rejecting the cargo owner's argument that COGSA should not apply to claims for damage to rice that had been delivered to the carrier.  The shipper, Uncle Ben's, argued that COGSA did not apply because the bills of lading did not issue until after the rice was containerized. Citing *Baker Oil*, the court concluded that the standard terms of the carrier's bill of lading covered the cargo, including during the preloading phase.  855 F.2d at 217.

In this case, the ISO tanks were damaged before they were loaded and before any bill of lading issued.  The record reveals that Interflow had used Hyundai as a carrier to transport goods on prior occasions.  Hyundai has offered competent summary judgment evidence that the bill of lading that would have issued to cover the ISO tanks would have been the standard Hyundai form, incorporating COGSA's limits on damages.  (Docket Entry No. 27, p. 7). Interflow has not identified or presented evidence that the parties intended to transport the ISO tanks under a bill of lading with different terms.  As in *Luckenbach*, the  bill of lading that Hyundai asserts governs the claim in this case was "in accordance with its standard form"; it was "issued to all shippers alike"; and it "was not made to fit a special case, in order to escape a liability that had already accrued."  The standard Hyundai bill of lading "but

evidenced the contract the parties entered into at the time the goods were delivered and accepted" by Hyundai for transportation. *Luckenbach*, 24 F.2d at 705.  Under *Baker Oil*, the Hyundai standard bill of lading applies, even though no bill of lading issued because the goods were never loaded.   In addition, defendants presented competent summary judgment evidence that the Hyundai tariff incorporates COGSA, and both the standard bill of lading and the tariff were available to Interflow on Hyundai's website.

Hyundai's standard bill of lading contained a provision limiting the carrier's liability for losses in transporting cargo to $500 per container. (Docket Entry No. 26, ¶ 3).  To take advantage of the limit on liability, Hyundai had to offer Interflow a "fair opportunity" to declare the true value of the shipment and pay a correspondingly higher shipping rate. *Sabah Shipyard Sdn. Bhd. v. M/V HARBEL TAPPER*, 178 F.3d 400, 404 (5th Cir. 1999) (citations omitted).   Interflow argues that it was "never offered an alternative rate structure" and therefore not given a fair opportunity to declare a higher rate.  (Docket Entry No. 31, p. 4). It relies on the affidavit of Roger L. Pillow, Jr., its general manager, to show that under the service agreement with Hyundai, "Interflow obtained a quote for the cost of the carriage from Hyundai, and was offered only a single flat rate for each container presented for carriage." (Docket Entry No. 31, p. 5; Ex. C).[2]  Interflow argues that it did not have a "fair opportunity"

---

[2]

Interflow argues that the "offered choice of rates" doctrine applies with greater force in this case because Hyundai misidentified the cargo and obtained a lower rate from Burlington.  (Docket Entry No. 31, p. 6).   Interflow does not cite authority to support this argument.   Whether Hyundai is liable for misdesignating the tanks is a separate issue from whether Hyundai offered Interflow a choice of shipping rates.  Interflow paid Hyundai less under the COGSA limitations than it would have if it had declared a higher value for the tanks.  *See Steel Coils, Inc. v. Captain Nicholas I M/V*, 197 F. Supp. 2d 560, 566 (E.D. La. 2002).  That Hyundai arguably later decreased its own costs in subcontracting out the land transportation of

to declare a higher rate because it never saw an actual list of various rates.

Courts of this circuit and others have consistently held that a provision in a bill of lading or a valid tariff that includes an opportunity to declare excess value is sufficient to afford the shipper a fair opportunity to avoid COGSA's limitation.  *See, e.g.*, *Brown & Root, Inc. v. M/V PEISANDER*, 648 F.2d 415, 420 & n.11 (5th Cir. 1981); *Wuerttembergishche & Badische Versicherungs-Atiengesellschaft v. M/V STUTTGART EXPRESS*, 711 F.2d 621, 622 (5th Cir. 1983); *Insurance Co. of N. Am. v. M/V OCEAN LYNX*, 901 F.2d 934, 939 (11th Cir. 1990).  In determining whether a shipper had a "fair opportunity" to avoid the limitations of COGSA, a carrier must make a *prima facie* showing of the opportunity for a choice of rates; the shipper must then present evidence that such an opportunity did not in fact exist. *Brown & Root*, 648 F.2d at 424.  In *Brown & Root*, the court held that a carrier made a *prima facie* showing of fair opportunity because the bill of lading expressly incorporated COGSA and the published tariff gave the shipper a choice of valuations by a choice among freight rates.  *Id.*  The court held that "COGSA § 4(5) does not prescribe that the face of the bill of lading contain a specific space or blank in which the increased valuation is to be inserted nor does it provide that the carrier rather than the shipper must actually make the notation."  *Id.* A carrier may make a *prima facie* showing of a fair opportunity by evidence that the carrier's published tariff includes an option to increase the cargo's valuation by declaration in exchange for paying a higher rate, regardless of whether the tariff provisions are incorporated

---

the goods to Burlington does not change the financial benefit that Interflow enjoyed by accepting Hyundai's $500 per package limitation of liability.

13

into the bill of lading.  *Wuerttembergische*, 711 F.2d at 622 (*cited in Sabah Shipyard*, 178 F.3d at 404).  Merely incorporating COGSA by reference in a bill of lading is not *prima facie* evidence, but reciting the actual language of COGSA or language to the same effect does meet the carrier's burden.  *Brown & Root*, 648 F.2d at 420–24; *Vision Air Flight Serv.*, 155 F.3d at 1168.  The required language need not be prominent or appear on the front of the bill of lading to provide a "fair opportunity."  *Id.* at 1168 n.3.  It may appear in fine print.  *Id.*

Under the subheading "Limitation of Liability for Loss or Damage," Hyundai's bill of lading provides:

> Neither the Ocean Carrier nor the Vessel shall be liable for loss or damage in an amount exceeding the minimum allowable limit per package or unit in the applicable version of the Hague Rules, which when the U.S. COGSA applies is U.S. $500 per package or, in the case of Goods not shipped in packages, per customary freight unit, unless the value (and nature) of the Goods higher than this amount has been declared in writing by the Merchant before receipt of the Goods by the Ocean Carrier and inserted on the face of this Bill of Lading, and extra freight has been paid as required.  If the actual value of the Goods per package or unit exceeds such declared value, the value shall nevertheless be deemed to be the declared value, and the Ocean Carrier's liability, if any, shall not exceed the declared value.  Any partial loss or damage shall be adjusted pro rata on the basis of such declared value.  If the declared value has been knowingly and fraudulently misstated, the Ocean Carrier shall not be liable to pay any amount.

(Docket Entry No. 27, Ex. A-5, ¶ 25).  Hyundai's standard bill of lading expressly alerted Interflow to the $500 per package limitation on liability and explained what Interflow needed to do to increase that limit.

The bill of lading also referred to Hyundai's tariff.  "This Bill of Lading is issued subject to the Ocean Carrier's applicable tariff.  Copies of the applicable tariff are obtainable

from the Ocean Carrier upon request."  (Docket Entry No. 27, Ex. A-5, ¶ 29).  Hyundai's

HMM tariff HDMU-Rule 12 (Ad Valorem Rates) also explained the procedure for declaring

a higher value:

> The liability of the Carrier as to the value of shipments at the rates herein
> provided in this Tariff shall be determined in accordance with the clauses of
> the Carrier's Bill of Lading (see Rule 8).  If the Shipper desires to be covered
> for a valuation in excess of that allowed by the Carrier's regular Bill of
> Lading, the Shipper must so stipulate in the manner required by the Carrier's
> Bill of Lading covering such shipment and such additional liability only will
> be assumed by the Carrier at the request of the Shipper and upon payment of
> an additional charge of two percent (2)% Ad Valorem of the total declared
> valuation in addition to the stipulated rate on the commodities shipped as
> specified herein.
>
> A Shipper who has elected to show value of the goods on the Bill of Lading
> shall be deemed to have desired to be covered for the value in excess of that
> allowed by the Carrier's regular Bill of Lading, and shall be assessed the
> additional Ad Valorem charge contained in this Rule.

(Docket Entry No. 27, Ex. A-3, ¶ B).  Interflow, as a longstanding Hyundai customer, had

a user number and password that provided access to  Hyundai's tariffs and standard bill of

lading on its website.

Interflow argues that the availability of the bill of lading and tariffs on Hyundai's

website did not serve as a fair opportunity to secure an alternative rate.  (Docket Entry No.

31, p. 6).  Interflow cites *Pan Am. World Airways, Inc. v. California Stevedore & Ballast

Co.*, 559 F.2d 1173 (9th Cir. 1977), but this case holds that a shipper is not deemed to know

of an opportunity to secure an alternative freight rate merely because it knows of COGSA,

if "such opportunity does not present itself on the face of the bill of lading."  *Id.* at 1177.

*Pan Am.* does not involve or address the shipper's ready access to a standard bill of lading or applicable tariff on a carrier's website.   Moreover, the court in *Pan Am.* focused on language in the bill of lading providing that the carrier's liability would "in no case" exceed the $500 per package limitation of COGSA.   The court held that the "in no case" language put the burden of showing that the shipper had a choice of rates on the carrier.  *Id.*  The bill of lading in this case incorporated no such language.   And unlike the bill of lading at issue in *Pan Am.*, the bill of lading and tariff provisions at issue here allowed Interflow the opportunity to declare a higher value.

Hyundai has made a *prima facie* showing that the fair opportunity requirement was satisfied.   Interflow has not identified or presented evidence to controvert Hyundai's showing.   The standard bill of lading and tariff provisions applied to the ISO tank shipment, and its limitations are binding on Interflow.

The applicable bill of lading contractually extended COGSA and its default liability limits of $500 per package through the time the goods were in Hyundai's custody, including the time when the ISO tanks sustained damage.   Interflow argues that the bill of lading had not yet "attached" to the tanks because the damage occurred before they had been "joined to a train for the purpose of carriage."  (Docket Entry No. 31, p. 8).  Hyundai's standard bill of lading included a Clause Paramount that provides:

> If this Bill of Lading covers Goods moving from ports of the United States in foreign trade, or if United States law is otherwise compulsorily applicable then carriage of such Goods shall be subject to the provisions of the United States Carriage of Goods by Sea Act, 46 U.S.C. §. 1300–1315 as amended (hereinafter "U.S. COGSA"), the terms of which shall be incorporated herein,

and the provisions of U.S. COGSA shall (except as otherwise provided in this
Bill of Lading) govern throughout the time when the Goods are in the custody
of the Ocean Carrier.

(Docket Entry No. 27, p. 3). The Clause Paramount extended the protections of COGSA

during the time that the "Goods [were] in the custody of the Ocean Carrier." (Docket Entry

No. 27, p. 3).  Interflow had left the goods at the Burlington  yard, in Hyundai's custody,

when the damage occurred. Interflow's damage claim is subject to applicable COGSA

protections.  *See, e.g.*, **Sabah Shipyard**, 178 F.3d at 407; **Baker Oil Tools**, 562 F.2d at 940;

*G.E. Power Sys., Inc. v. Indus. Maritime Carriers (Bahamas) Inc., AS*, 89 F. Supp.2d 782,

783 (E.D. La. 2000).   The COGSA limits incorporated into the standard bill of lading and

tariff apply to the time when the tanks were damaged.

The applicable bill of lading and tariff also provide that Hyundai may hire

subcontractors and extend the applicable protections and liability limits to those

subcontractors. (Docket Entry No. 27, Ex. A-5, ¶ 4).  The bill of lading contains a Himalaya

Clause that provides:

> "Subcontractor" includes stevedores, longshoremen, lighterers, terminal
> operators, warehousemen, truckers, agents, and any person, corporation, or
> other legal entity that performs any of the Ocean Carrier's obligations under
> this Bill of Lading, and includes the Subcontractor's own Subcontractor.
>
> The Ocean Carrier shall be entitled to subcontract on any terms the whole or
> any part of the handling, storage, or carriage of the Goods and any duty
> undertaken by the Ocean Carrier in relation to the Goods.
> . . . .
> Without prejudice to the foregoing, in regard against a Subcontractor regarding
> handling, storage or carriage of the Goods, every such Subcontractor shall
> have the benefit of all provisions in this Bill of Lading as if such provisions
> were expressly for the Subcontractor's benefit.

(*Id.*).   A broadly-written Himalaya Clause extends a bill of lading's limitation of liability to a subcontractor, such as Burlington.  *Norfolk S. Ry. v. Kirby*, 125 S. Ct. 385, 397–98 (2004). Interflow afforded Hyundai "free reign" to use subcontractors.  (Docket Entry No. 30, p. 3). The bill of lading broadly protected any subcontractor or agent that "perform[ed] any of the Ocean Carrier's obligations under th[e] Bill of Lading . . . ."  (Docket Entry No. 27, Ex. A-5, ¶ 4).   The bill of lading's liability limitations protected Burlington, limiting its liability for damage to the containers to $500 per package or customary freight unit.

Interflow concedes that the Himalaya Clause would normally protect Burlington, but argues that Burlington cannot invoke this extension of COGSA in Hyundai's bill of lading. Interflow argues that after Hyundai incorrectly designated the cargo, Burlington "repudiated" its contract with Hyundai and "terminat[ed] the pass-through provision" of the Hyundai bill of lading. (Docket Entry No. 30, p. 8).   Interflow offers no authority  to support this argument.  The letter Interflow cites as evidence of Burlington's contract "repudiation" does not "repudiate" the Hyundai bill of lading or tariff, or Hyundai's subcontract with Burlington.  Instead, Burlington's letter cites Items 26 and 45 of Burlington's Rules and Policies Guide, stating, "Under the circumstances, since this restricted equipment was improperly billed with the BNSF, we would not accept responsibility for the loss incurred." (Docket Entry No. 30, Ex. D).[3]  Interflow's argument does not support displacing the

---

[3]

Item 26 of that Guide provided:

The restricted commodities and equipment described in this Item can only be tendered to BNSF when the following conditions are met.  Violation of any condition covered in this

COGSA limits on liability.

COGSA limits a carrier's liability to $500 "per package or unit."  In the case of goods not shipped in packages, the limit applies per customary freight unit.  Interflow argues that bulk oil products are not in a "package" when carried within a tank container.  (Docket Entry No. 31, p. 10).  Interflow argues that any liability limitation would apply instead to "customary freight units" and that Hyundai has not offered evidence regarding its basis of freight calculation, precluding summary judgment.  (Docket Entry No. 31, p. 10).  Interflow cites *Shinko Boeki Co. v. S.S. "PIONEER MOON,"* 507 F.2d 342 (2d Cir. 1974), to support

Item will result in a $5,000 charge per vehicle, in addition to the freight charges and any other applicable charges payable by the shipper.  The shipper will also be responsible for any and all charges incurred to recondition rail-controlled equipment.  Failure to adhere to all restricted commodities or equipment provisions places all aspects of liability with the shipper.  The shipper is liable for any incident and all associated costs resulting from tendering restricted commodities and equipment including, but not limited to, distressed loads, derailments, loss of life, injury, destruction and contamination of property, equipment, lading, and structures, remediation, restoration, and train and terminal operations.

The shipper holds BNSF harmless for any or all acts of negligence if the provisions are not followed.

Item 45 of the Guide provided:

Loaded tank containers (isotanks) must be obtained from or delivered to a BNSF facility using only drop frame (lowboy) chassis.  Empty tank containers do not require delivery with lowboy chassis.  Commodities loaded in tank containers must meet the U.S. Department of Transportation regulations. . . . Tank containers must be marked with "AAR 600", indicating the tank container is compliant with AAR specifications. . . .  The commodity description must be printed legibly in a waterproof medium on both sides of the tank container.  Letters of the description must be at least two inches in height. . . .  The placement of the name must conform to the same specifications for placarding stated in Item 27: Hazardous Commodities.
Tank Containers are Restricted equipment and must be tendered with a special price authority for this type of equipment.  (See Item 26: Restricted Commodities, Equipment, and Associated Charges.)

(Docket Entry No. 26, pp. 3–4).

the argument that bulk oil products are not "packages" when carried in a tank.  In *Shinko Boeki*, the court analogized the tanks used to ship liquid latex to cargo carried in the ship's tanks, without any packaging.  *Id.* at 345.  The tanks "were the carrier's property, used on voyage after voyage, not included in computing the freight charges, and apparently filled while under the supervision of a representative of the carrier.  In practical effect they were a smaller and movable version of the deep tanks.  They were 'functionally part of the ship' . . . ." *Id.*  In this case, by contrast, Interflow supplied the tank containers and delivered them loaded with the cargo of fuel oil to the Burlington yard in Pearland, Texas.  (Docket Entry No. 27, pp. 1–2; Docket Entry No. 31, Ex. C, ¶ 1).  In *In re M.V. Floreana*, 65 F. Supp.2d 489, 493 (S.D. Tex. 1999), the court held that a tank filled with liquid was a package for the purpose of determining a carrier's liability.  "Bulk goods are not limited, but these tanks are not bulk; they are 'containerized' and just happen to have fluid contents.  If the liquid cargo had filled the hold—the ship's own tanks—it would be a shipment in bulk. [The tanks] are limited to $500 each." *Id.*

The applicable Hyundai bill of lading limits the carrier's liability to $500 per package or unit,  and provides:

> Where the Goods have been packed into a container or unitized into a similar article of transport by or on behalf of the Merchant, it is expressly agreed that the number of such containers or similar articles of transport shall be considered to be the number of packages or units for the purpose of the application of the limitation of liability provided for in this Article 25.

(Docket Entry No. 27, Ex. A-5, ¶ 25(B)(2)).  The bill of lading defines "goods" as "the cargo

described on the face of this Bill of Lading and, if the cargo is in containers supplied or furnished by or on behalf of the Merchant, include the containers as well." (*Id.*, ¶ 1(E)).  It defines "package" as "containers, vans, trailers, pallets, vehicles, and similar packaged units of any description, but not Goods shipped in bulk." (*Id.*, ¶ 1(G)).  The sea waybill for this shipment has a space for "No. of Containers or Other Pkgs" and identifies the tanks as follows:  "1 X 20FT S.O. ISOTANK(S): LUBRICATING OIL ADDITIVES (LUBE OIL ADDITIVES)."  (Docket Entry No. 27, Ex. A-6).  Significantly, the sea waybill does not designate the oil as "in bulk," although prior sea waybills between Interflow and Hyundai had used that term.  (*See, e.g.*, Docket Entry No. 27, Ex. A-10) (describing the goods as "1 X 20FT S.O. ISOTANK(S): (IN BULK) AMINES, LIQUID, CORROSIVE, FLAMMABLE, N.O.S. (N, N-DIMENTHYL-1, 3-PROPANEDIAMINE)).  Because the applicable bill of lading describes the ISO tanks as packages, the sea waybill lists the containers as packages, and this circuit's precedent holds that tanks supplied by the shipper loaded with liquid contents are "containers," this court holds that each ISO tank was a "package" for the purpose of the COGSA liability limitation.  Defendants' liability for damage is limited to $500 for each tank.

## IV.    Interflow's Cross-Motion for Summary Judgment

Interflow has moved for summary judgment that Hyundai is responsible for the costs of repairing the damaged ISO tanks in which the cargo was shipped.  (Docket Entry No. 31, p. 10).  Interflow cites to Item 26 of Burlington's Intermodal Rules and Policies Guide, which provides, in part, that "[t]he shipper will also be responsible for any and all charges

incurred to recondition rail-controlled equipment."  There are several problems  with this argument.

First, there is a dispute as to whether the misdesignation of the tanks was the fault of Interflow or Hyundai.  An affidavit from C.W. Paik, a Hyundai claims manager, states that "information as to the product and amount of cargo comes from Interflow."  (Docket Entry No. 27, Ex. A).  In the relevant sea waybill, Interflow lists the contents of the tanks as "lubricating oil additives."  (Docket Entry No. 27, Ex. A-6).   Second, Interflow has not explained why it may sue Hyundai under the contract between Hyundai and Burlington. Third, the Hyundai/Burlington subcontract on its face states that a shipper that fails to comply with the relevant items of the Burlington Intermodal Rules and Policies Guide is liable for "any and all charges incurred to recondition rail-controlled equipment" and "any incident and . . . associated costs resulting from tendering restricted commodities and equipment."  There is no basis to conclude that the tank containers, owned by Interflow, were "rail-controlled equipment" that had to be reconditioned because the cargo was misdesignated as "FAK."  Nor is there any basis to conclude that the damage resulted from misdesignating the cargo.  Finally, the bill of lading defines "goods" as "the cargo described on the face of this Bill of Lading and, if the cargo is in containers supplied or furnished by or on behalf of the Merchant, include the containers as well."  (Docket Entry No. 27, Ex. A-5, ¶ 1(E)).  The  bill of lading and tariff limit Hyundai's liability for damage to "goods" to $500 per container.  (Docket Entry No. 27, p. 3; Docket Entry No. 26, ¶ 3).  The damage to the containers, under the bill of lading, is included in the total liability limit of $500 per

container.

Interflow's cross-motion for summary judgment against Interflow is denied.

## V.    Conclusion

This court grants defendants' joint motion for partial summary judgment and Burlington's motion for summary judgment as to damages.  Defendants' liability to Interflow is limited to $500 per tank, for a total of $1,000.   This court denies Interflow's cross-motion for summary judgment.   Because this court has granted defendants' motion for partial damages, this court does not reach Burlington's alternative motion for summary judgment as to liability.

SIGNED on November 29, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge